## THE PEOPLE *a.* WILSON.*

*Supreme Court, Third District; Oyer and Terminer, February,* 1859.

### NEW TRIAL.—MISBEHAVIOR OF JURY.

On a trial for murder it was proved, and not contradicted nor questioned, that the deceased was drowned by being rendered insensible in the water by a blow upon the head. Before the defence was gone into, one of the jurors took up and examined a piece of the skull of the deceased, which was on the district attorney's table. After conviction, counsel for the prisoner, on their own affidavit of this fact, moved for a new trial.

*Held,* no ground for a new trial. 1. The juror's examination could not have influenced his mind upon such a state of evidence.

2. The counsel knew of it before entering on the defence, and therefore had full opportunity to offer testimony and argument on the point.

Affidavits of counsel and others, as to information derived from jurors respecting misbehavior of the jury, are not admissible to impeach the verdict.

The affidavits of jurors, that the constable, at the request of a juror, handed to that juror a paper showing the punishments for the different degrees of the crime, are not admissible to impeach the verdict. They go to show an act on the part of their own body; and are, therefore, within the rule excluding jurors' affidavits.

A new trial was moved for on the ground that the constable, at the request of a juror, handed them a paper showing the different degrees of punishments of the crime.

*Held,* that they having afterwards been explicitly instructed by the court on the question of degree, their attempt to take into consideration the punishment, could not be deemed to prejudice the defendant. It could only have been an attempt in his favor; and their verdict against him could not have been influenced by it; and a new trial must be denied.

Motion for a new trial.

This was the prosecution of an indictment for murder. After prisoner had been convicted of murder, his counsel moved before the Oyer and Terminer for a new trial, on grounds of misconduct and irregularities on the part of the jury. Two of the jurors made affidavits, that while the jury was deliberating, at

* Compare The People *a.* Hartung, *Ante,* 132.

the request of one of the jurors, the officer having the jury in charge, handed him a paper containing a list of the punishments of the different degrees of manslaughter.

It further appeared from an affidavit made by the counsel, that one of the jurors had examined the skull of the deceased, which was lying on the table of the district attorney, before the evidence had closed on the part of prosecution, and before the defence had been entered into.

The reading of the affidavits of the jurors was objected to, on the ground that they were inadmissible.

*Henry Smith* and *J. M. Kimball*, for the prisoner.

*Samuel G. Courtney*, district attorney, for the people.

GOULD, J.—The affidavits of Mr. Smith and Mr. Kimball, as to *information* from jurors concerning what took place in the jury-room, are utterly inadmissible. They are far worse in principle than the affidavits of jurors themselves to impeach their verdict, inasmuch as the jurors, *without oath*, have given information which is not admissible on their own statement *under oath*.

The affidavits of Mr. Smith and Mr. Kimball, with that of Mr. Holstein, are then pertinent only on the point that, during the trial, a juror took up and examined the piece of the skull of the murdered man, which was on the district attorney's table. This was (even if the juror be wrong as to the time) after the testimony for the People was rested, and at the time the adjournment was had, at the request of the prisoner's counsel, and *before* going into the defence. Even had it not been known to the prisoner's counsel, it was in the state of the proof of no manner of consequence; for the uncontradicted evidence (and evidence which was not thereafter even called in question) was, that the death was caused by this blow's rendering the deceased insensible, so that in the water he was incapable of helping himself, and was drowned; and that the wound was made by a blow with some blunt instrument. And no extent of a juror's examination could have helped him to a different conclusion. But another complete answer to the point is, that, as the fact of the juror's taking up that bone was well known to the prisoner's counsel before they entered on the defence, they had full opportunity for

producing, and (in the act) notice to produce, on that point—proof as to the nature and consequences of the wound—any evidence they saw fit—as well as full opportunity to comment in argument on the juror's act, and ask the court to make suitable comment thereon. In no view of it is this ground for a new trial.

As to the presence of the constables in the jury-room, I acquiesce in the opinion given by Judge Harris, in the Hartung case. (*Ante,* 132.) At the same time, I should hope that the jury-rooms will be so arranged that the constables may have a convenient and suitable place for remaining in *by themselves,* when in charge of a jury in any case, civil or criminal.

The remaining ground on which a new trial is asked is, that a constable, at the request of a juror, handed to that juror a paper on which were marked the punishments fixed by law for the different degrees of manslaughter. The affidavits of the jurors as to this point, I was at first disposed to admit to this extent only: that such a paper was handed to a juror before the verdict was agreed upon. The comments and deliberations of the jury, whether referring to that or any point in the case, come clearly within the rule that jurors are not allowed to make affidavits to impeach their own verdicts. And I know of no sounder rule of the law. Any other rule would permit a juror, whose conscience, bound by his oath, would not allow him to refuse his assent to a verdict—would permit such a juror, I say, to commit or procure an irregularity that would, on his own affidavit thereof, avoid the verdict. It would open the door for such mischiefs as could not be endured. I have said, I was at first disposed to admit parts of these jurors' affidavits. But, upon reflection, I am satisfied that they should be entirely excluded, as they go to show an act done at the request of a juror, and so to set up the act of their own body to impeach their verdict, and so are open to the full force of my last position.

The affidavit of Simpson, the constable, is, that this paper was handed to the juror before the jury came into court for further instructions. And the position of the case would seem conclusive, that the constable must be correct as to the time, though he differs as to that from the two jurors. The further instructions had been so entirely clear and explicit, that it was not even claimed by the prisoner, that if convicted of the homicide at all, the conviction could be any thing but murder, or man--

slaughter in the *third* degree; that there was no pretence that the offence was either.the first or second degree of manslaughter. And after so explicit a direction, acquiesced in by the prisoner's counsel, it can hardly be that any jury would ask information as to the punishment for the first and second degrees.

Taking this to be so, how is it probable, or even possible, that the prisoner was prejudiced by information that the statutes fixed imprisonment in the State prison from two to four years, as the punishment for manslaughter in the third degree; and that information given prior to their coming into court for instructions, where they might have asked any and all questions they saw fit, on any point pertaining to the case. I confess that the only construction I am able to give their act in asking for the information is, that it was an attempt to evade the duty that they felt bearing upon their consciences,—the duty of saying that they felt satisfied that the killing was done by the prisoner, and that he had not shown any circumstances to reduce that killing below the grade of murder.

The act was, unquestionably, an irregularity. It was an attempt to do what a jury has no legal right to do,—to render a verdict based on the punishment, not on the truth. But the attempt could have been only in favor of the prisoner. I cannot see how it is possible that the verdict rendered was in any way produced by the information. I am, however, unwilling to lose this opportunity of saying, that if jurors cannot learn that they are under oath to "*render a true verdict, according to the evidence,*" and that they are *absolutely bound* to take the *law from the court, and leave to the law the consequences* of a *true* verdict, the sooner we are rid of the privilege of trial by jury, the better for the community.

A new trial cannot be granted.